IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

LORI ROBINS,                                          CASE NO.:

      Plaintiff,

v.

ASHFORD GREEN AT ABERDEEN
ASSOCIATION INC.; CHAMPAGNE &
PARISI REFERRAL, LLC d/b/a
CHAMPAGNE & PARISI REAL ESTATE;
BONNIE SEIDLER, P.A.

      Defendants.

_____/

## COMPLAINT

COMES NOW Plaintiff, LORI ROBINS (hereinafter referred to as "Plaintiff"), by and through the undersigned Counsel, and brings this action against Defendants, ASHFORD GREEN AT ABERDEEN ASSOCIATION INC ("ASHFORD GREEN"); CHAMPAGNE & PARISI REFERRAL, LLC, d/b/a/ CHAMPAGNE & PARISI REAL ESTATE ("CHAMPAGNE & PARISI"); and BONNIE SEIDLER, P.A. ("SEIDLER") (referred to collectively "Defendants"), and in support thereof, alleges the following:

## JURISDICTION AND VENUE

1.     This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 343 for Plaintiff's claims arising under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq. and 28 U.S.C. §§ 1331, 343 for Plaintiff's claims arising under Title 42 U.S.C. § 12182 et. seq., based on Defendant's violations of Title III of the ADA.  See also, 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1291, over Plaintiff's claims under the Florida Fair Housing Act ("FLFHA"), § 760.20, et seq.

2.      Venue is proper in the Southern District of Florida, West Palm Beach Division, under 28 U.S.C. § 1391(b) because the claim arose in this judicial district.

## PARTIES

3.      Plaintiff, LORI ROBINS is a resident of the State of Florida, an individual with a qualified disability, and is otherwise *sui juris*.

4.      Defendant, ASHFORD GREEN is a subdivision of Aberdeen Golf & Country Club ("Aberdeen"), the homeowner's association where the property giving rise to this dispute is located (in Boynton Beach, Florida).

5.      Defendant, CHAMPAGNE & PARISI, is the brokerage company, located in Boca Raton, Florida, responsible for orchestrating the sale of the relevant property and the hiring and supervision of the primary realtor overseeing this transaction.

6.      Defendant, SEIDLER, is the primary realtor who was working under the aforementioned brokerage and was the primary point of contact for the relevant transaction. (CHAMPAGNE & PARISI and SEIDER are collectively referred to as the "REALTOR DEFENDANTS")

## GENERAL ALLEGATIONS

7.      Plaintiff suffers from a "qualified disability" under the FHA, ADA, and FLHA. Plaintiff is legally blind, a multiple organ transplant recipient, and a survivor of uterine cancer. As such, she is considered disabled in accordance with federal, state, and local county ordinances.

8.      The nature of Plaintiff's vision impairment is as follows: **Left Eye**: total retinal detachment, *zero vision*; **Right Eye**: excessive retinal tissue scarring from eight (8) retinal vitrectomies (reattachment surgeries) with a central tunnel of vision measuring 3-6 degrees, out of the 270 degrees of visual range enjoyed by sighted people.

9.      At the time of dispute, Plaintiff owned three licensed service dogs who were specifically trained to perform adaptive tasks to aid with her disabilities.  All three service dogs were required for Plaintiff to be able to live independently, as they each performed critically different roles;  two were certified by the Board of Health as "Medic Alert Response Animals"; one is trained to use olfactory senses to detect and alert to medical scents, such as impending seizures, low blood sugar, dehydration and electrolyte imbalances associated with Plaintiff's multiple organ transplants, now 25 years old; the second is trained to activate a device to contact 9-1-1 should Plaintiff lose consciousness; the third is trained to assist Plaintiff in adapting to low vision by locating items at Plaintiff's request.

10.      Plaintiff was a prospective buyer of a particular property located at 6912 Cairnwell Drive (hereinafter referred to as "the Property"), in the ASHFORD GREEN's subdivision of Aberdeen Golf & Country Club ("Aberdeen"), located in Boynton Beach, Florida.

11.      Plaintiff initially attempted to access information about the property online through the REALTOR DEFENDANTS' websites.   Plaintiff attempted to access https://www.bocaratonrealestate.com and http://www.bonnieseidler.com, both websites where the REALTOR DEFENDANTS had advertised that the premises was listed as available. However, these websites were inaccessible to Plaintiff. Both websites were unable to be read using Plaintiff's screen reader.

12.      As a result of being unable to access, Plaintiff was forced to resort to phone calls and emails to communicate regarding the listing without being able to gather any information online.

13.      On February 11, 2022, Plaintiff initiated several communications to Defendant, SEIDLER, via phone calls, emails, and text messages about the purchase of the Property.

14.     Plaintiff first contacted SEIDLER via telephone and expressed her interest in the Property due to its proximity to the Clubhouse. Plaintiff disclosed to SEIDLER that this was especially important to her given her visual impairments. This disclosure prompted SEIDLER's subsequent discriminatory questioning and interference.

15.     SEIDLER inquired whether Plaintiff had service dogs, to which Plaintiff replied that she had three and that she required each of them to live independently.

16.     SEIDLER then insisted that proof of Plaintiff's disability was required in order to submit Plaintiff's purchase offer. In Plaintiff's experience, proof of disability had never been required to submit an offer or purchase a home.

17.     Additionally, ASHFORD GREEN's application to purchase a property only required the registration of all "pets." It did not require registration of "service animals," nor was there space to indicate the need for such accommodation on the application for purchase. As such, Plaintiff would not have been required to disclose her dependence on service animals or her disabilities as part of the application process.

18.     While submitting a Request for Accommodation for her service animals to ASHFORD GREEN would have been appropriate post-occupancy, SEIDLER requiring such information in the offer stage was shocking to Plaintiff.

19.     Plaintiff repeatedly emphasized her discomfort to SEIDLER in sending such personal documentation and communicated that her disability and need for service animals are a private and confidential matter. Plaintiff feared that this would allow her disability status and her need for service animals to inappropriately be considered in the purchasing process. However, Plaintiff sent such documentation anyway because she was intent upon procuring the Property.

20.     Plaintiff informed SEIDLER that she would call her to discuss what "proof" was needed so she could send it over as soon as possible. She also, again, requested that SEIDLER not discuss or forward her documentation.

21.     After discussing the required documents list with Plaintiff by phone, SEIDLER's final words were "get those documents to me right away, because the Seller wants a cash offer this weekend."

22.     Plaintiff promptly emailed SEIDLER proof of her disability, her service dog licenses, and poof of cash on hand.  Plaintiff simultaneously requested a virtual walk-through with SEIDLER, since no other agent was involved at that point, as well as an "as-is" contract.

23.     Plaintiff also included her written purchase offer for the Property with the following terms: $300,000.00, 5-day inspection, first deposit of $10,000.00 to be made before inspection, second deposit of $20,000.00 to be made after inspection, closing on or before March 31, 2022, with an expiration date of February 13, 2022, at 5:00 pm.

24.     SEIDLER responded that the seller would require a $30,000 initial deposit.

25.     Plaintiff replied that she was amenable to providing the $30,000 initial deposit at contract, but that she would not provide a second deposit after inspection.

26.     SEIDLER responded, that she had spoken to the seller, and stated to Plaintiff that the "villa is yours."

27.     Later that evening, SEIDLER informed Plaintiff via text message that her partner, Susan Moore, a fellow realtor in the brokerage of CHAMPAGNE & PARISI, would write up her offer and that Ms. Moore would call Plaintiff the following morning. SEIDLER further explained that while SEIDLER represented the seller in the sale transaction, Ms. Moore would represent Plaintiff.

28.     The following morning, however, SEIDLER informed Plaintiff via text message that the seller had accepted another offer and asked the Plaintiff to not call or message her further.

29.     At no point during the evening prior had SEIDLER mentioned another buyer or the need to increase her offer.  Given SEIDLER's prior assurance that the villa was her's, Plaintiff was shocked that the seller had changed his mind, and suspected that SEIDLER had misused Plaintiff's personal, confidential information, despite promising to not do so.

30.     Plaintiff looked up the name and contact information of ASHFORD GREEN's HOA President at the time, Anthony Casselli, hoping to get some clarity on the situation.

31.     When she contacted him by phone, Mr. Casselli knew exactly who Plaintiff was, her disabilities, and that she depended on her three service animals for independent living.  Prior to this conversation, Plaintiff had never spoken to Mr. Casselli so his knowledge of her personal circumstances could have only come from SEIDLER disclosing Plaintiff's private and confidential information.

32.     During their phone call, Mr. Casselli acknowledged that SEIDLER had contacted him, questioning whether ASHFORD GREEN's HOA would approve a buyer with three service animals, to which he vehemently refused.

33.     Mr. Casselli angrily disclosed to Plaintiff that approval of her three service dogs, regardless of her medical needs, would be "over his dead body" and that he "did not want blind people and their service dogs running around the golf course."

34.     Mr. Casselli went on to say that he, as President of ASHFORD GREEN, would not approve her application "so don't even bother submitting it. And don't try to sneak in here!  I have run this place for 30 years and I make the rules."

35.     Plaintiff informed him that she is a disability discrimination advocate and that his conduct amounted to discrimination in violation of the FHA.

36.     Mr. Casselli responded that he did not care who Plaintiff was or what she did and that she could call his attorney on Monday.

37.     When Plaintiff asked him to provide the name of his attorney, Mr. Casselli hung up on her.

38.     Plaintiff was unable to locate an email address for Mr. Caselli, so she texted him from the contact number she found regarding the context of their conversation and asked him to have his attorney contact her regarding his discriminatory policy.

39.     Plaintiff then contacted SEIDLER's broker, Defendant, CHAMPAGNE & PARISI, to report that SEIDLER had violated her civil rights and discriminated against her.

40.     Plaintiff also contacted the Aberdeen HOA's President, Mr. Ed Heller, who is also an attorney, and relayed a summary of the facts of the situation to him via email later that day. In the email, Plaintiff included her text and email correspondences with SEIDLER.

41.     Mr. Heller agreed with Plaintiff that she had been discriminated against, and subsequently notified the rest of the ASHFORD GREEN Board along with Mr. Caselli.  Mr. Heller subsequently resigned from his post as Aberdeen HOA President and was promptly replaced by Dennis Chuka, who is now a Board Member of The Aberdeen Golf and Country Club.

42.     On Saturday, February 12, 2022, just several hours later, SEIDLER emailed Plaintiff stating that the seller did not want a lawsuit. SEIDLER explained that Mr. Casselli would speak to their attorney on Monday to see if Plaintiff was "correct," and if Plaintiff was correct, she would be permitted to purchase the villa with the same terms as Plaintiff's original offer.

43.     Requests for accommodations are submitted to and decided by ASHFORD GREEN, **after** prospective buyers complete their sale and occupy their residence. (*emphasis added*). SEIDLER's request for proof of Plaintiff's disability blocked this process and prevented Plaintiff from submitting a formal offer to the Seller, applying to ASHFORD GREEN, purchasing the Property and filing a Request for Accommodation for her service animals.

44.     SEIDLER subjected Plaintiff to a process that differed from that applied to every other prospective buyer of REALTOR DEFENDANTS' property listings, resulting in Plaintiff being discriminated against due to her disability.

45.     Mr. Caselli also subjected Plaintiff to a pre-approval process that differed from that applied to every other prospective owner's application, resulting in Plaintiff being discriminated against due to her disability.

46.     ASHFORD GREEN's buyer application had no requirement that anything aside from a "pet" be registered. Plaintiff had no pets. Plaintiff had no requirement to disclose her disabilities or service animals to SEIDLER or to ASHFORD GREEN prior to taking residence in the Property in question, after which she would have made a Request For Accommodation pursuant to the FHA.

47.     SEIDLER wrongfully disclosed Plaintiff's disability and request for accommodation with Mr. Casselli, as evidenced by his knowledge of Plaintiff's disability and need for three service dogs, leading him to deny her application on that basis.

48.     Plaintiff clearly expressed interest in purchasing the home as evidenced by her willingness to jump through unnecessary hoops.

49.     Plaintiff specifically overbid on the Property and in the particular subdivision of Aberdeen in which the Property was located because the Property accommodated her disability

allowing her to walk to the Clubhouse and enjoy other amenities with ease as Plaintiff cannot drive due to her visual impairments.

50.     Notwithstanding, even with her cooperation in providing documentation of her disability and service dogs, Plaintiff was denied equal opportunity to purchase the Property due to SEIDLER, CHAMPAGNE & PARISI, and ASHFORD GREEN's combined discrimination against her for Plaintiff's medical dependence on her three licensed service animals and her visual impairment.

51.     Due to Defendants' discriminatory mistreatment, Plaintiff lost out on a home in a prime location that accommodated her disability.

## COUNT I - VIOLATION OF THE FAIR HOUSING ACT
## AGAINST ALL DEFENDANTS

52.      Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 51 above as if fully set forth herein.

53.     The FHA prohibits discrimination against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. 42 U.S.C. § 3604(f)(2).

54.     The FHA defines discrimination to include a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

55.     Additionally, the FHA prohibits the interference with any person in exercising their rights under the FHA. 42 U.S.C. §3617.

56.     The Property at ASHFORD GREEN is a "dwelling" under the FHA because it is intended for occupancy as a residence by one or more families. 42 U.S.C. § 3602(b).

57.     As set forth above, Plaintiff is disabled within the meaning of the FHA and, as such, falls within a protected class.

58.     Defendants knew or should have known that Plaintiff was a disabled person under the FHA, as Plaintiff disclosed this information to SEIDLER, who then communicated this information to Mr. Casselli during sales negotiations.

59.     As set forth above, Plaintiff informed SEIDLER of her requirement of a reasonable and necessary accommodation to ASHFORD GREEN's rules policies, practices, or services to permit Plaintiff to reside with her three service animals.

60.     Plaintiff's required accommodation is reasonable and necessary to afford her an equal opportunity to use and enjoy the Property.

61.     Defendants prevented Plaintiff the opportunity to submit a request for a reasonable and necessary accommodation in its rules policies, practices, or services regarding her service animals.

62.     Specifically, as alleged above, SEIDLER prevented Plaintiff the opportunity to apply to purchase the Property at issue by requiring her to submit proof of her disability prematurely. After applying to purchase the Property at ASHFORD GREEN, Plaintiff would have been permitted to submit a request for accommodations for her service dogs. SEIDLER's interference directly prevented this process.

63.     Further, ASHFORD GREEN President, Mr. Casselli promptly communicated his refusal to approve Plaintiff's request regardless of her medical needs

64.     Specifically, Mr. Casselli stated that he "did not want blind people and their dogs running around the golf course" and that he "would not approve her application" "so don't even both submitting it." Mr. Casselli's statement clearly indicted discrimination directed at a protected

class, in this case blind individuals, satisfying the elements to establish a prima facie case under the FHA.

65.     Defendants discriminated against Plaintiff in violation of the FHA by making direct discriminatory statements and refusing to make the requested reasonable and necessary accommodation in its rules, policies, practices, or services. 42 U.S.C. § 3604(f)(1)(A).

66.     Under the FHA, the conduct described above constitutes discrimination in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. 42 U.S.C. § 3604(f)(2)(A).

67.      Defendants' conduct constitutes an ongoing and continuous violation of the FHA and unless restrained from doing so, Defendants will continue to violate the FHA.

68.     As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered irreparable loss and injury, including but not limited to actual damages, humiliation, emotional distress, and deprivation of the right to equal housing opportunities regardless of disability status.

69.     Under 42 U.S.C. § 3613, a court may enjoin such discriminatory practice, and award the aggrieved party actual and punitive damages, reasonable attorney's fees, and costs.

## COUNT II - VIOLATION OF THE FLORIDA FAIR HOUSING ACT AGAINST ALL DEFENDANTS

70.     Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 51 above as if fully set forth herein.

71.     The FLFHA prohibits discrimination against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. Fla. Stat. § 760.23(2).

72.     The FLFHA defines discrimination to include a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. Fla. Stat. § 760.23(9)(b).

73.     Additionally, the FLFHA prohibits the interference with any person in exercising their rights under the FLFHA.  Fla. Stat. § 760.37.

74.     The Property at ASHFORD GREEN is a "dwelling" under the FLFHA because it is intended for occupancy as a residence by one or more families. Fla. Stat. § 760.22(5).

75.     As set forth above, Plaintiff is a member of protected classes under the FLFHA based on disability and, as such, is an aggrieved party.

76.     Defendants knew or should have known that Plaintiff was a disabled person under the FHA, as Plaintiff disclosed this information to SEIDLER, who then communicated this information to Mr. Casselli during sales negotiations.

77.     As set forth above, Plaintiff informed SEIDLER of her requirement of a reasonable and necessary accommodation to ASHFORD GREEN's rules policies, practices, or services to permit Plaintiff to reside with her three service animals.

78.     Plaintiff's required accommodation is reasonable and necessary to afford her an equal opportunity to use and enjoy the Property.

79.     Defendants prevented Plaintiff the opportunity to submit a request for a reasonable and necessary accommodation in its rules policies, practices, or services regarding her service animals.

80.     Specifically, as alleged above, SEIDLER prevented Plaintiff the opportunity to apply to purchase the Property at issue by requiring her to submit proof of her disability

prematurely. After applying to purchase the Property at ASHFORD GREEN, Plaintiff would have been permitted to submit a request for accommodations for her service dogs. SEIDLER's interference directly prevented this process.

81.    Further, ASHFORD GREEN President, Mr. Casselli promptly communicated his refusal to approve Plaintiff's request regardless of her medical needs

82.    Specifically, Mr. Casselli stated that he "did not want blind people and their dogs running around the golf course" and that he "would not approve her application" "so don't even both submitting it." Mr. Casselli's statement clearly indicted discrimination directed at a protected class, in this case blind individuals, satisfying the elements to establish a prima facie case under the FLFHA.

83.    Defendants discriminated against Plaintiff in violation of the FLFHA by making direct discriminatory statements and refusing to make the requested reasonable and necessary Defendants discriminated against Plaintiff in violation of the FLFHA by refusing to make the requested reasonable and necessary accommodation in its rules, policies, practices, or services. Fla. Stat. § 760.23(9)(b).

84.    Under the FLFHA, the conduct described above constitutes discrimination in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. Fla. Stat. § 760.23(4)

85.     Defendants' conduct constitutes an ongoing and continuous violation of the FLFHA and unless restrained from doing so, Defendants will continue to violate the FLFHA.

86.    As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered irreparable loss and injury, including but not limited to actual damages, humiliation,

emotional distress, and deprivation of the right to equal housing opportunities regardless of disability status.

87.     Under Fla. Stat. § 760.35(4), a court may enjoin such discriminatory practice, and award the aggrieved party actual and punitive damages, reasonable attorney's fees, and costs.

## COUNT III – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST REALTOR DEFENDANTS

88.     Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 3, 5 through 12, 44, 48, and 51 above as if fully set forth herein.

89.     On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from enactment of the statute to implement its requirements.  The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993 if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. See 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

90.     Congress found, among other things, that:

   a.   some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

   b.   historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

   c.   discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d.  individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e.  the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

91.   Congress explicitly stated that the purpose of the ADA was to:

a.  provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b.  provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c.  invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

92.   Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment

of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

93.     REALTOR DEFENDANTS' websites and REALTOR DEFENDANTS' office they operate out of, namely 151 N Ocean Boulevard, Boca Raton, FL 33432 (hereinafter the "REALTOR Premises") are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

94.     There is a physical nexus between REALTOR DEFENDANTS' websites and the REALTOR Premises in that the websites provide the contact information, operating hours, and access to listings being offered by REALTOR DEFENDANTS. REALTOR DEFENDANTS' websites operate as an online platform that showcase properties and facilitate real estate referrals managed by REALTOR DEFENDANTS. The REALTOR Premises serves as the business's physical anchor, reinforcing its presence and operations in the Boca Raton real estate market, directly linking the online services with the company's physical headquarters.

95.     The opportunity to search and utilize REALTOR DEFENDANTS' Websites from home to explore properties and connect with agents is a crucial accommodation for Plaintiff, as traveling outside her home as a visually disabled individual can be difficult, hazardous, and confusing. REALTOR DEFENDANTS have not provided their business information in a digital format accessible for blind and visually impaired individuals using screen reader software, depriving them of the ability to independently access important real estate services, benefits, and opportunities available through the website.

96.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods,

services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

97.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

98.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

99.     Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or

have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to REALTOR DEFENDANTS' Websites because of her disability. She has not been provided services that are provided to other patrons who are not disabled, and/or have been provided services that are inferior to the services provided to non-disabled persons. REALTOR DEFENDANTS have failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

100.    Plaintiff attempted to access and/or utilize REALTOR DEFENDANTS' Websites, but was unable to, and she continues to be unable to enjoy full and equal access to REALTOR DEFENDANTS' Websites and/or understand the content therein because numerous portions of REALTOR DEFENDANTS' Websites do not interface with Plaintiff's screen reader software. Specifically, features of REALTOR DEFENDANTS' Websites that are inaccessible to Plaintiff's screen reader software include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines):

**I.      Accessibility Barriers on www.bonnieseidler.com:**

**A. Barriers on Homepage**

1. **Missing Alt Text**: Images lack alternative text, preventing screen readers from conveying essential information to visually impaired users (WCAG 2.0 A, 1.1.1).

2. **ARIA Input Fields**: Missing accessible names for input fields, affecting usability for screen readers (WCAG 2.0 A, 4.1.2).

3. **Low Color Contrast**: Text and background colors do not meet the required contrast ratio, making content difficult to read (WCAG 2.0 AA, 1.4.3).

4. **Missing Language Attribute**: The page lacks a lang attribute, hindering screen reader functionality (WCAG 2.0 A, 3.1.1).

5. **Links Lack Discernible Text**: Links are not clearly labeled, making navigation confusing for screen reader users (WCAG 2.0 A, 2.4.4, 4.1.2).

6. **Nested Interactive Controls**: Improperly nested controls disrupt screen reader focus and usability (WCAG 2.0 A, 4.1.2).

**B. Additional Barriers on Property Page (6912 Cairnwell Drive):**

1. **Low Color Contrast**: The text does not meet minimum contrast standards, affecting readability (WCAG 2.0 AA, 1.4.3).

2. **Links Not Distinguishable by Color Alone**: Links are identified solely by color, making them difficult for color-blind users to recognize (WCAG 2.0 A, 1.4.1).

3. **Links Without Discernible Text**: Links lack clear, descriptive text, making them inaccessible for screen reader users (WCAG 2.0 A, 2.4.4, 4.1.2).

**II.     Accessibility Barriers on www.bocaratonrealestate.com:**

**A. Barriers on Homepage**

1. **Unsupported ARIA Attributes**: Some elements use ARIA roles not supported by the attributes, making them inaccessible to assistive technologies (WCAG 2.0 A, 4.1.2).

2. **Invalid ARIA Attribute Values**: ARIA attributes do not conform to valid values, causing potential screen reader errors (WCAG 2.0 A, 4.1.2).

3. **Missing Alt Text for Images**: Images lack alternative descriptions, which screen readers rely on to convey information (WCAG 2.0 A, 1.1.1).

4. **Focusable ARIA-Hidden Elements**: Elements marked as aria-hidden are still focusable, leading to confusion for screen reader users (WCAG 2.0 A, 4.1.2).

5. **ARIA Input Fields Missing Accessible Names**: Input fields without accessible names disrupt form navigation (WCAG 2.0 A, 4.1.2).

6. **Low Color Contrast**: Insufficient contrast between text and background colors makes content difficult to read for visually impaired users (WCAG 2.0 AA, 1.4.3).

7. **Links Not Distinguishable Without Color**: Links rely solely on color for differentiation, making them hard to identify for color-blind users (WCAG 2.0 A, 1.4.1).

8. **Links Without Discernible Text**: Links lack clear and descriptive text, hindering navigation (WCAG 2.0 A, 2.4.4, 4.1.2).

9. **Incorrect List Structure**: Lists are not properly structured, affecting the way screen readers interpret the content (WCAG 2.0 A, 1.3.1).

10. **Nested Interactive Controls**: Improper nesting of interactive elements disrupts screen reader announcements and focus management (WCAG 2.0 A, 4.1.2).

**B. Additional Accessibility Barriers on Property Page (6912 Cairnwell Drive):**

1. **Low Color Contrast**: The text does not meet WCAG 2.0 AA minimum contrast ratio thresholds, affecting readability for visually impaired users (WCAG 2.0 AA, 1.4.3).

2. **Links Not Distinguishable Without Color**: Links are differentiated only by color, making them hard to identify for color-blind users (WCAG 2.0 A, 1.4.1).

3. **Links Without Discernible Text**: Links lack clear descriptive text, which impairs navigation for screen reader users (WCAG 2.0 A, 2.4.4, 4.1.2).

4. **Incorrect List Structure**: Lists contain incorrect elements like non-<li> children, causing issues for screen reader interpretation (WCAG 2.0 A, 1.3.1).

These accessibility barriers significantly impact usability for people with disabilities and violate WCAG standards, highlighting the need for remedial actions to ensure compliance with ADA requirements.

101.    More violations may be present on other pages of REALTOR DEFENDANTS' Websites, which can and will be determined and proven through the discovery process and when the websites are reviewed by an accessibility expert.

102.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other business entities in making their websites accessible. Incorporating such basic components to make the Websites accessible would neither fundamentally alter the nature of REALTOR DEFENDANTS' business nor would it result in an undue burden to REALTOR DEFENDANTS.

103.    REALTOR DEFENDANTS thus have failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

104.    To the best of Plaintiff's belief and knowledge, REALTOR DEFENDANTS have failed to eliminate the specific violations set forth in paragraph 101 herein. As a result, REALTOR DEFENDANTS have violated the ADA -- and continue to violate the ADA -- by denying access to REALTOR DEFENDANTS' Website by individuals, such as Plaintiff, with visual disabilities who requires the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the REALTOR DEFENDANTS' Website are ongoing.

105.    Although REALTOR DEFENDANTS are charged with having knowledge of the violations, REALTOR DEFENDANTS may not have actual knowledge of said violations until this Complaint makes REALTOR DEFENDANTS aware of same.

106.    As a direct and proximate result of REALTOR DEFENDANTS' failure to provide an ADA compliant Website, with a nexus to its REALTOR Premises, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of REALTOR DEFENDANTS' Websites and Premises.

107.    Because of the inadequate development and administration of the REALTOR DEFENDANTS' Websites, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

108.    Plaintiff has retained the undersigned counsel for the pursuit, filing and prosecution of this action. Plaintiff is entitled to have his reasonable attorneys' fees, costs and expenses paid by REALTOR DEFENDANTS, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

109.    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief; including an order to:

    a.  Require REALTOR DEFENDANTS to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Websites to a statement as to the REALTOR DEFENDANTS' policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through the Websites.

    b.  Require REALTOR DEFENDANTS to take the necessary steps to make the Websites readily accessible to and usable by visually disabled users, and during that time period prior to the Websites being readily accessible, to provide an alternative

method for individuals with visual disabilities to access the information available on the Websites until such time that the requisite modifications are made, and

  c. Require REALTOR DEFENDANTS to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with the Websites for purposes of viewing and locating Realtor Premises, and becoming informed of and purchasing homes/listings, and during that time period prior to the Websites being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Websites.

**PRAYER FOR RELIEF – COUNT III ADA – REALTOR DEFENDANTS**

WHEREFORE, Plaintiff requests entry of judgment in her favor and against REALTOR DEFENDANTS for the following relief:

A. A declaration that REALTOR DEFENDANTS' Websites are in violation of the ADA;

B. An Order requiring REALTOR DEFENDANTS, by a date certain, to update REALTOR DEFENDANTS' Websites, and continue to monitor and update REALTOR DEFENDANTS' Websites on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, REALTOR DEFENDANTS' Website and effectively communicate with REALTOR DEFENDANTS' Websites to the full extent required by Title III of the ADA;

C. An Order requiring REALTOR DEFENDANTS, by a date certain, to clearly display the universal disabled logo within REALTOR DEFENDANTS' Websites, wherein the logo would lead to a page which would state REALTOR DEFENDANTS' accessibility information, facts, policies,

and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of REALTOR DEFENDANTS' Websites;

D. An Order requiring REALTOR DEFENDANTS, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing REALTOR DEFENDANTS, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow REALTOR DEFENDANTS to undertake and complete corrective procedures to REALTOR DEFENDANTS' Websites;

F. An Order directing REALTOR DEFENDANTS, by a date certain, to establish a policy of web accessibility and accessibility features for REALTOR DEFENDANTS' Websites to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on REALTOR DEFENDANTS' Websites to be fully accessible to the visually disabled;

H. An Order directing REALTOR DEFENDANTS, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, the Websites on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing REALTOR DEFENDANTS, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of REALTOR DEFENDANTS'

Websites to identify any instances where REALTOR DEFENDANTS' Websites are no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing REALTOR DEFENDANTS to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing REALTOR DEFENDANTS, by a date certain, to make publicly available and directly link from REALTOR DEFENDANTS' Websites' homepage, a statement of their Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of the Websites and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

## PRAYER FOR RELIEF –  COUNTS I AND II – FHA COUNTS - ALL DEFENDANTS

WHEREFORE, Plaintiff demands judgment against Defendants, ASHFORD GREEN; CHAMPAGNE & PARISI; and SEIDLER, and requests the following relief:

a.   Declaring that the policies and procedures of Defendants violate the FHA and FLFHA, in that they fail to consider and accommodate the needs of disabled individuals such as the Plaintiff;

b.   Directing Defendants to grant Plaintiff's necessary and reasonable accommodation permitting her to have a live-in aide;

c.   Awarding compensatory and punitive damages pursuant to 42 U.S.C. § 3613;

d.   Awarding reasonable attorneys' fees and costs; and

e.   Any further relief this Court deems necessary, just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiff, LORI ROBINS, by and through the undersigned counsel, demands a trial by jury

on all issues so triable.

Dated: October 1, 2024.

                                    **Sconzo Law Office, P.A.**
                                    3825 PGA Boulevard, Suite 207
                                    Palm Beach Gardens, FL 33410
                                    Telephone: (561) 729-0940
                                    Facsimile: (561) 491-9459

                                    By: ***/s/ Gregory S. Sconzo***
                                    GREGORY S. SCONZO, ESQ.
                                    Florida Bar No.: 0105553
                                    MICHELLE C. GENAO, ESQ.
                                    Florida Bar No. 1050251
                                    **Primary Email:** greg@sconzolawoffice.com
                                    **Primary Email:** michelle@sconzolawoffice.com
                                    **Secondary Email:** perri@sconzolawoffice.com